**UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY**

|  |  |
|---|---|
| In re: COPAXONE ANTITRUST LITIGATION | Master Docket No. 22-1232 (JXN)(JSA)<br><br>**OPINION** |

**NEALS**, District Judge

      This is one of two pharmaceutical antitrust cases involving Copaxone, a drug used to treat multiple sclerosis.[1] Before the Court is Special Master Faith S. Hochberg's ("Special Master") Report and Recommendation ("R&R") recommending the Court grant Defendant Teva's[2] motion to dismiss in part the Complaint. (ECF No. 128.) Plaintiffs Walgreen Co., the Kroger Co., Albertsons Companies, Inc., and H-E-B, L.P. ("Retailers") objected to the R&R (ECF No. 242), and Teva replied (ECF No. 252). The Court has carefully considered the parties' submissions and decides this matter without oral argument pursuant to Federal Rule of Civil Procedure[3] 78 and Local Civil Rule 78.1. For the reasons set forth below, the Court **ADOPTS** the R&R (ECF No. 128).

---

[1] For the related case, *see Mylan Pharms. v. Teva Pharms. Indus. Ltd.*, No. 21-13087.

[2] "Teva" collectively refers to Defendants Teva Pharmaceuticals, Ltd., Teva Pharmaceuticals USA, Inc., Teva Neuroscience, Inc., and Teva Sales & Marketing, Inc.

[3] "Rule" or "Rules" hereinafter refer to the Federal Rules of Civil Procedure.

## I.    BACKGROUND

### A.    Drug Regulations

To frame the antitrust issues in this case, the Court describes the relevant legal framework for approving and dispensing new drugs.

#### i.    *Approving New Drugs*

The Drug Price Competition and Patent Term Restoration Act of 1984, codified at 21 U.S.C. § 355 *et seq.*, commonly referred to as the Hatch-Waxman Act, governs the approval of new drugs. A drug manufacturer "wishing to market a new prescription drug" must submit a New Drug Application ("NDA") to the Food and Drug Administration ("FDA") "and undergo a long, comprehensive, and costly testing process, after which, if successful, the manufacturer will receive marketing approval from the FDA." *F.T.C. v. Actavis, Inc.*, 570 U.S. 136, 142 (2013) (quoting 21 U.S.C. § 355(b)(1)). After the FDA approves a new drug whose active pharmaceutical ingredient has not been previously approved for any other drug, the manufacturer may exclusively make and sell that product for five years. 21 U.S.C. § 355(c)(3)(E)(ii).

"One of the goals of Hatch-Waxman is to increase competition between generic and brand-name drugs. To that end, the Act allows the manufacturers of generic drugs to obtain FDA approval without having to endure the gauntlet of procedures associated with NDAs." *In re Wellbutrin XL Antitrust Litig. Indirect Purchaser Class*, 868 F.3d 132, 143 (3d Cir. 2017). So, after the FDA approves a brand-name drug, Hatch-Waxman permits a generic drug manufacturer to submit an Abbreviated New Drug Application ("ANDA") "specifying that the generic has the 'same active ingredients as,' and is 'biologically equivalent' to, the already-approved brand-name drug." *Actavis*, 570 U.S. at 142 (quoting *Caraco Pharm. Lab'ys, Ltd. v. Novo Nordisk A/S*, 566 U.S. 399, 404 (2012)). Filing an ANDA allows "the generic to piggy-back" on the brand-name drug's prior

approval, eliminating the need to undergo the same "costly and time-consuming studies" as the brand-name drug. *Id.* (quoting *Eli Lilly & Co. v. Medtronic, Inc.*, 496 U.S. 661, 676 (1990)).

Hatch-Waxman also "sets forth special procedures for identifying, and resolving, related patent disputes" between NDAs and ANDAs. *Id.* at 143. The Act requires the "brand-name manufacturer to list in its [NDA] the 'number and the expiration date' of any relevant patent." *Id.* (quoting 21 U.S.C. § 355(b)(1)). The FDA then publishes the approved NDA, along with its corresponding patent numbers and expiration dates, "in a fat, brightly hued volume called the Orange Book (less colorfully but more officially denominated Approved Drug Products with Therapeutic Equivalence Evaluations)." *Caraco Pharm.*, 566 U.S. at 405–06.

Because the FDA "cannot authorize a generic drug that would infringe a patent," a generic drug company filing an ANDA "must assure the FDA that its proposed generic drug will not infringe the [brand drug's] patents." *Id.* The generic manufacturer "can provide this assurance in one of several ways." *Actavis*, 570 U.S. at 143. One option, relevant here, is called a "Paragraph IV Certification," wherein the generic manufacturer certifies that "any listed, relevant patent 'is invalid or will not be infringed by the manufacture, use, or sale' of the drug described in the [ANDA]." *Id.* (quoting 21 U.S.C. § 355(j)(2)(A)(vii)).

A Paragraph IV Certification "automatically counts as patent infringement." *Id.* "If the brand-name patentee brings an infringement suit within [forty-five] days, the FDA then must withhold approving the generic, usually for a [thirty]–month period, while the parties litigate patent validity (or infringement) in court." *Id.*; *see also* 21 U.S.C. § 355(j)(5)(B)(iii). "If the courts decide the matter within that period, the FDA follows that determination; if they do not, the FDA may go forward and give approval to market the generic product." *Actavis*, 570 U.S. at 143 (citing 21 U.S.C. § 355(j)(5)(B)(iii)).

### ii.      Dispensing New Drugs

The Complaint notes that many states have "automatic substitution" laws. (Compl. ¶ 74, ECF No. 2.) Automatic substitution laws require pharmacies to substitute generic drugs for brand drugs "even if the prescription specifies the brand drug." (*Id.*) The Retailers, however, allege automatic substitution cannot occur where a prescription for a brand drug states, "Dispense as Written" ("DAW"). (*Id.* ¶ 157.)

### B.      Copaxone

Teva makes and sells Copaxone, an injectable drug used to treat multiple sclerosis. (*Id.* ¶ 87.) The FDA first approved Copaxone in a 20mg vial in December 1996. (*Id.* ¶ 88.) In its initial form, users would inject themselves with Copaxone. (*See id.*) The FDA approved syringes pre-filled with 20mg of Copaxone for daily injectable use on February 12, 2002. (*Id.*) The patents for 20mg Copaxone expired in May 2014. (*Id.* ¶¶ 103.)

Sandoz, a pharmaceutical company, filed an ANDA for generic 20mg Copaxone in December 2007 (*id.* ¶ 92), which the FDA approved in April 2015. (*Id.* ¶ 94).

In 2013, Teva filed a supplemental NDA ("sNDA") for 40mg Copaxone in a pre-filled syringe, to be injected three times a week, which the FDA approved in January 2014. (*Id.* ¶ 89.) The legal exclusivity for 40mg Copaxone expired on January 28, 2017. (*See id.* ¶¶ 89, 131.)

Mylan, another pharmaceutical company, filed ANDAs for generic 20mg Copaxone in June 2009 (*id.* ¶ 97), and generic 40mg Copaxone on February 12, 2014. (*Id.* ¶ 98). The FDA approved both ANDAs on October 3, 2017. (*Id.* ¶ 99.) Mylan launched its generic 20mg and 40mg Copaxone the next day. (*Id.* ¶ 100.)

### C.      Pharmacy Benefit Managers

Pharmacy Benefit Managers ("PBMs") are middlemen between health insurance companies and consumers. (*Id.* ¶ 81.) They negotiate drug prices with manufacturers and reimbursements with pharmacies. (*Id.* ¶ 82.) Many PBMs also own specialty pharmacies. (*Id.*) PBMs create lists of prescription drugs (called formularies) "for which the health plan will reimburse pharmacies on behalf of the plan's members." (*Id.*) If a drug is not on a formulary, a health insurance company generally does not cover it, and the patient must pay for it out-of-pocket. (*Id.*) The Retailers allege the PBM market is highly concentrated. (*Id.* ¶ 83.) The Retailers also claim PBMs "have a prominent role" in determining what drugs patients get and how much they cost. (*Id.* ¶ 84.) According to the Retailers, a drug manufacturer's "rebating strategies" can influence a PBM's decisions. (*Id.*)

### D.      The Scheme to Protect Copaxone

The Retailers allege that Teva engaged in four kinds of anticompetitive conduct to protect Copaxone from generic competition. (*See, e.g.*, *id.* ¶ 102.)

#### i.      *Exclusionary Agreements with PBMs*

First, the Retailers claim Teva entered "exclusionary agreements" with PBMs to block generic Copaxone from entering the market. (*Id.* ¶¶ 147, 155.) Teva allegedly strong-armed PBMs into excluding generic Copaxone from their formularies, meaning insurers would not cover the generic. (*Id.* ¶ 148.) The Retailers also state that Teva offered PBMs additional rebates if their specialty pharmacies filled prescriptions with brand Copaxone, regardless of how the prescription was written. (*Id.* ¶ 151.)

### ii.     The DAW Campaign

The Retailers next allege Teva directed its pharmaceutical sales representatives to make false and misleading statements about generic Copaxone's safety and efficacy. (*See id.* ¶¶ 157–69.) The goal was reportedly to persuade doctors to write DAW prescriptions for brand Copaxone. (*Id.* ¶¶ 159, 161.) The Retailers assert that Teva stated "without any scientific basis" that generic Copaxone was only 80% to 85% as effective as brand Copaxone, and that generic Copaxone makers "did not offer injection training or nursing support to patients." (*Id.* ¶ 162.) The Retailers claim the DAW Campaign worked—according to internal Teva reports, DAW prescriptions for brand Copaxone went from 13% to more than 77% in less than four months. (*Id.* ¶ 166.)

### iii.     The Market Shift

The Retailers claim that after Sandoz filed an ANDA for generic 20mg Copaxone in 2007, Teva planned to shift the Copaxone market towards a new 40mg dose. (*Id.* ¶¶ 120–44.) Prior to 2007, Teva conducted clinical trials to test the efficacy of daily 40mg Copaxone. (*Id.* ¶ 123.) By 2008, however, those clinical trials allegedly showed a daily 40mg dose was not more effective than a daily 20mg dose. (*Id.*) The Retailers allege Teva nevertheless pivoted towards switching patients from a daily 20mg dose to a less frequent 40mg dose. (*Id.* ¶¶ 121, 126–27.) The Retailers aver that 40mg Copaxone taken three times a week was not significantly more convenient for patients (*id.* ¶ 126); rather, Teva sought to switch patients to 40mg Copaxone to create a barrier for generic competition (*id.* ¶¶ 129–30.)

The Retailers claim Teva switched the market from 20mg to 40mg Copaxone by pricing the 40mg dose lower than the 20mg dose, discontinuing copay assistance for 20mg Copaxone, pressuring PBMs to add 40mg Copaxone to their formularies, "enlisting PBMs to aggressively

lobby doctors to switch their patients to the new dosage" and making sales bonuses contingent on selling 40mg Copaxone. (*Id.* ¶ 132.)

#### iv.    *Charitable Donation Copay Assistance*

Relying on allegations from a 2020 lawsuit the Department of Justice ("DOJ") brought against Teva under 42 U.S.C. § 1320a-7b(b), the anti-kickback statute, the Retailers claim Teva paid charitable organizations more than $300 million to offer copay assistance for privately-insured and Medicare-enrolled patients on brand Copaxone, but not generic Copaxone. (*Id.* ¶¶ 170–87.) The goal, according to the Retailers, was to keep brand Copaxone cheap so patients would not switch to a generic alternative. (*Id.* ¶ 182.)

#### v.    *Effects*

The Retailers state that Teva's scheme to protect Copaxone worked. (*Id.* ¶¶ 188–91.) The Retailers claim that a brand drug's market share often falls to 10% or less during the first year a generic is on the market. (*Id.* ¶ 188.) Not so for Copaxone. (*Id.* ¶¶ 188–89.) The Retailers assert that Teva was "so effective at blocking generic Copaxone" that it still controls over 60% of the Copaxone market, years after generic competition began, and even with generic Copaxone manufacturers cutting prices in half. (*Id.* ¶¶ 189–91.) Likewise, the Retailers allege Teva's hold on the Copaxone market forced patients and purchasers to buy brand Copaxone, despite the availability of cheaper generics. (*Id.* ¶ 196.)

### E.    Procedural History

#### i.    *The Complaint*

Four drug wholesalers[4] ("Original Plaintiffs") filed a putative class action lawsuit against Teva in 2022. (*See generally id.*) The class included any company that bought Copaxone directly

---

[4] FWK Holdings, LLC; KPH Healthcare Services d/b/a Kinney Drugs, Inc.; Meijer, Inc.; and Meijer Distribution, Inc.

from Teva. (*Id.* ¶ 192.) Count One alleges Teva's alleged exclusionary contracts with PBMs violated the Sherman Act § 2, 15 U.S.C. § 2. (*See id.* ¶¶ 232–41.) Count Two alleges the exclusionary contracts, DAW campaign, market switch, and copay assistance comprised an overall monopolization scheme in violation of the Sherman Act § 2. (*Id.* ¶¶ 242–51.) Count Three alleges Teva's copay assistance scheme violated the Racketeer Influenced and Corrupt Organizations ("RICO") Act, 18 U.S.C. § 1962(c). (*Id.* ¶¶ 252–63.)

### ii. *The Motion to Dismiss*

Teva moved to dismiss the Complaint. (Mot. to Dismiss, ECF No. 40.) Teva argued the Complaint failed to plausibly allege Teva had monopoly power. (*Id.* at 13–23.) As for Count One, Teva argued the "price-cost" test should apply to the exclusionary agreements, and under the "price-cost" test, Teva's conduct could not be deemed anticompetitive. (*Id.* at 24–31.) As for Count Two, Teva argued none of the conduct asserted supported an overall monopolistic scheme. (*Id.* at 31–49.) Teva asserted the "market switch" allegations failed because Teva did not force patients to switch to 40mg Copaxone, the Complaint did not otherwise allege coercion, and the market switch was time-barred. (*Id.* at 31–39.) Teva then asserted that the DAW Campaign was not anticompetitive because the Original Plaintiffs failed to plausibly allege actionable misstatements, and the campaign was a legitimate form of competition. (*Id.* at 39–44.) Teva next argued the copay assistance allegations failed because it was not anticompetitive, and the anti-kickback statute did not supply a private cause of action. (*Id.* at 44–47.) Finally, Teva argued Count Three failed to plausibly allege a RICO predicate act or causation and was time-barred. (*Id.* at 50–65.) The Original Plaintiffs opposed (Original Pls.' Opp'n, ECF No. 50), and Teva replied (Teva Reply, ECF No. 69).

In August 2023, the Court appointed a Special Master. (Order of Appointment, ECF No. 109.) The Special Master's duties include "making recommendations to the Court regarding . . . pretrial motions to dismiss." (*Id.* at 3–4.) In light of the Order of Appointment, the Court referred Teva's motion to dismiss to the Special Master. (Transfer Order, ECF No. 111.) The Special Master held oral argument on the motion on December 12, 2023, January 8, 2024, and March 1, 2024. (*See* R&R at 4, ECF No. 128.)

### iii.    The R&R

The Special Master issued a February 27, 2025 R&R recommending the Court grant in part Teva's motion to dismiss. (*See id.*)

First, the Special Master concluded the Original Plaintiffs plausibly alleged direct and indirect evidence of Teva's monopoly power. (*Id.* at 17–19.)

Next, the Special Master recommended the Court deny Teva's motion to dismiss Count One. (*Id.* at 19–29.) The Special Master concluded that the allegations in the Complaint were not appropriate for resolution under the "price-cost" test, and that under the "rule of reason" test, the Original Plaintiffs plausibly alleged the exclusive agreements with PBMs were anticompetitive. (*Id.*)

On Count Two (the overall monopolistic scheme), the Special Master noted that the Complaint grouped four categories of anticompetitive conduct under a single cause of action. Accordingly, the Special Master evaluated whether she could rule on the sufficiency of each allegation of anticompetitive conduct "separately" or "whether all allegations of conduct, whether or not individually violative of the antitrust laws, should be considered collectively as part of an alleged overall scheme of anticompetitive conduct." (*Id.* at 30.)

After reviewing applicable Third Circuit caselaw, the Special Master concluded that:

if one or more components [of an anticompetitive scheme] are plausibly alleged to be exclusionary, then other components that are not plausibly alleged to be individually unlawful can nonetheless be considered as part of an overall scheme only if the independently lawful acts are plausibly alleged to augment the exclusionary effect of the conduct that has been properly alleged to be exclusionary.

(*Id.* at 35.) Thus, the Special Master described her analytical approach as follows:

[E]ach category of conduct alleged in the Complaint is analyzed both as to whether it is plausibly pled as unlawful on its own; and if the answer to that question is "no," the analysis proceeds to look at whether it is plausibly pled as having a synergistic role that exacerbates the exclusionary effect of the plausibly alleged exclusionary acts. If that answer is "yes", then it can be properly alleged as part of an "overall scheme."

This test requires thoughtful analysis of the many component parts to determine first if some of them are plausibly alleged to be exclusionary, standing alone. It then considers the other components alleged to be part of the overall scheme, even if not plausibly pled as independently exclusionary, to determine whether they are plausibly pled to augment the exclusionary effect of the conduct properly pled as "exclusionary" under the antitrust laws. The analysis further requires that the combined conduct be plausibly pled as injurious to competition in the market as a whole, and not just to the plaintiff individually.

(*Id.* at 36.)

### a.    The DAW Campaign

Teva argued that (1) the DAW Campaign was a legitimate form of competition; (2) the Original Plaintiffs did not adequately allege false statements; (3) the statements were presumed to have a *de minimis* effect on competition; and (4) the Original Purchasers failed to allege any harm. (*Id.* at 37.) The Special Master rejected each argument and recommended the Court deny Teva's motion to dismiss the DAW Campaign allegations. (*Id.* at 39.)

### b.    The Market Switch

The Special Master referred to the alleged market switch as a "soft" product market shift. (*Id.* at 40.) Unlike most "hard switch" (or "product hop") cases, "where a pharmaceutical company withdraws an existing product from the market and replaces it with a new product with longer patent life," the Special Master noted that both the 20mg and 40mg Copaxone doses remained on

10

the market. (*Id.*) Instead, the Original Plaintiffs alleged Teva took actions to shift the market towards demand for the 40mg dose. (*Id.*)

However, Teva argued the "market shift" theory had a "timeline flaw." (*Id.* at 41.) Because the Sherman Act has a four-year statute of limitations and the Original Plaintiffs sued in 2022, the Original Plaintiffs could not recover for antitrust injuries occurring before 2018. (*Id.*) But Teva argued the purported market shift took place between 2014 and 2015. (*Id.*) Further, in Teva's telling, generic 40mg Copaxone hit the market in 2017, meaning "an allegation of harm stemming from the lack of an available 40mg generic" after 2017 could not be plausible. (*Id.*)

The Special Master found the parties "agree that, absent tolling under the doctrine of fraudulent concealment, the [Original Plaintiffs] could not recover for damages incurred outside of the limitations period." (*Id.* at 42.) The Special Master observed that fraudulent concealment allegations must be "pled with the particularity required of all fraud claims" under Rule 9(b). (*Id.*) That is, the plaintiff must show (1) an affirmative act of concealment (2) misleading the plaintiff (3) who exercised due diligence in investigating their cause of action. (*Id.* at 42–43 (quoting *In re Lower Lake Erie Iron Ore Antitrust Litig.*, 998 F.2d 1144, 1178–79 (3d Cir. 1993).) And, while courts have relaxed Rule 9(b)'s requirements where the essential factual information is within the defendant's knowledge or control, the plaintiff must allege facts suggesting fraudulent concealment and why additional information lies within the defendant's exclusive control. (*Id.* (citations omitted).)

The Special Master, however, identified only two paragraphs in the Complaint alleging Teva concealed the market shift. (*Id.* (quoting Compl. ¶¶ 224–25).) Those paragraphs claimed Teva offered a pretextual reason for the market shift—Teva told the public, (1) the 40mg dose offered more convenience and value, and (2) the switch was driven by research and development.

(*Id.* at 43.) But the Plaintiffs claimed Teva's sole motivation was to maintain Copaxone's market dominance. (*Id.* at 43–44.) The Special Master determined:

> If a 40mg market shift claim had been timely filed, there could have been a genuinely disputed fact issue as to whether the large dose, administered by injection less often, was promoted for the purpose of patient convenience, or was instead introduced for another reason. But, for purposes of alleging fraudulent concealment, an allegation that the "motive" of patenting and marketing the less frequent dose differed from the company's PR statements, does not rise to the level of an affirmative act of fraudulent concealment. Teva's assertion to the public that patient convenience—for a less frequently administered dose—is certainly not remotely close enough to a falsehood as to constitute fraud—even under the "relaxed" Rule 9(b) standard. One can argue about what motive was the "real reason", but that does not a fraud claim make. The concept that Teva had an ulterior motive for introducing the dose, and pricing it as it did, is so broad that it would sweep in too much commercial activity in an attempt to rescue stale claims than is supported by the law of fraudulent concealment as a means to toll the statute of limitations. None of the legal authorities in this Circuit relied on by the [Original Plaintiffs] supports this allegation of conduct as an affirmative act of fraud.

(*Id.* at 44.)

In the alternative, the Original Plaintiffs argued Teva's conduct was "inherently self-concealing," because disclosing it would have subjected Teva to liability. (*Id.* at 45.) The Special Master similarly rejected that argument, finding:

> While there may be some antitrust conspiracies that depend on secrecy to such an extent that any action in furtherance of it can also be said to conceal it, the DPPs have cited no fact pattern remotely analogous to the highly public set of facts in this case that supports the application of this "inherently self-concealing" doctrine here. Teva's 40mg supplemental New Drug Application that obtained FDA approval was fully public; the pricing was public; the dates when statutory exclusivity expired were public; etc.

(*Id.* at 45.) Thus, because the Original Plaintiffs failed to plausibly allege fraudulent concealment or "inherently self-concealing" fraudulent conduct, the Complaint's market-shift theory was untimely and could not independently support § 2 liability.

The Special Master then considered whether the Complaint plausibly alleged the market shift enhanced the effect of the overall monopolistic scheme. (*Id.* at 47.) She concluded that it did

12

not. (*Id.*) The Special Master remarked that the Complaint alleged Teva initiated the exclusionary

agreements and DAW Campaign in late 2017, and 2018. (*Id.*) The market shift, by contrast, took

place in 2014, and 2015. (*Id.*) Accordingly, the Special Master determined that:

> Shifting market demand from the 20mg to the 40mg dose during a time period when the 20mg faced no generic competition, is separate and distinct from the allegations of the Complaint that assert conduct taken to deter generic competition after all doses have received FDA approval [in 2017]. There is no plausibly articulated synergy between them. The Complaint alleges no facts to support a plausible inference that the 2014-2015 market shift had any impact on competition in the market once there was a competing 40mg generic in 2017.

(*Id.* at 47–48.) The Special Master thus recommended the market shift allegations be dismissed

from the Complaint. (*Id.* at 48.)

### c.     Copay Assistance

#### 1.     *Privately Insured Patients*

The Special Master first noted that the Original Plaintiffs alleged Teva offered copay

assistance for both privately insured and Medicare patients. (*Id.* at 49.) According to the Special

Master, copay support for privately insured patients would not violate the anti-kickback statute.

(*Id.*) Teva, however, argued that copay assistance to privately insured patients was "mere

competition on price," and therefore, could not independently form the basis of a Sherman Act §

2 claim. (*Id.*) The Original Plaintiffs did not "address this sub-set of the allegations, nor provide

any caselaw to support the theory that legal copay assistance can form the basis of a Sherman Act

claim." (*Id.*) Thus, because the Original Plaintiffs did not state "any contrary arguments nor

caselaw in its brief as to how this legal conduct could be actionable as part of a Sherman Act

claim," the Special Master recommended dismissing the copay assistance allegations to the extent

they were premised on privately insured patients. (*Id.*)

#### 2.     *Medicare Patients*

Though the Special Master noted the antikickback statute did not have a private cause of action, she found "the salient issue in an antitrust claim is not whether the conduct may violate another statute or regulation, but rather whether it is exclusionary and harms both the plaintiff and the market as a whole." (*Id.* at 50.) "The focus is always on whether the conduct is exclusionary from an antitrust perspective, meaning that it plausibly harms both the plaintiff and the market as a whole." (*Id.*) The Special Master then stated:

> The thrust of the Copay Assistance allegations, for the segment of the patients who were government-insured, is that Teva could not directly pay Medicare patients to defray their copay costs, because such payments would violate the Anti-Kickback Statute. Thus, the [Original Plaintiffs] allege that Teva made charitable donations, but took specific steps to ensure that the contributions were directed by the charity to the recipients Teva wanted to reach—patients taking Copaxone. In this manner . . . , the [Original Plaintiffs] allege that this conduct by Teva lowered patients' out-of-pocket costs for the brand drug and thereby increased Copaxone sales.

(*Id.* at 51.)

Teva, on the other hand, argued the Complaint did not adequately plead how this assistance harmed competition. (*Id.*) Rather, the bare act of lowering a patient's out-of-pocket costs and making a product more affordable was not anticompetitive. (*Id.*) Likewise, while the Complaint alleged copay assistance "suppressed generic competition," it did not allege any facts beyond lowering patient costs. (*Id.* at 51–52.) Further, the Special Master remarked that the Complaint's assertion about copay assistance suppressing generic competition was "further undermined" by the fact that the copay assistance "occurred for nine years before there was an available generic." (*Id.* at 52.) Thus, the Special Master concluded the Complaint's allegations about copay assistance did not, standing alone, violate the Sherman Act § 2.

The Special Master also determined the copay assistance did not plausibly fall within an overall anticompetitive scheme. (*Id.* at 52–53.) She stated:

14

The Copay Assistance conduct overwhelmingly occurred before there was a generic GA alternative; defraying a patient's copay costs prior to there being a generic alternative is disconnected in time, and in substance, from the alleged exclusionary PBM agreements and alleged DAW Campaign. The Complaint does not, and cannot, plausibly allege that the Copay Assistance conduct in 2006 through 2015 augmented the anticompetitive effect of later actions by Teva, as alleged in the exclusionary agreements and DAW Campaign portions of the overall scheme. There are no facts alleged stating how Copay Assistance to Copaxone patients prior to the time when there was any generic on the market contributed to the harm of suppressing generic competition alleged to have resulted from the DAW Campaign and exclusionary agreements. There is thus no plausibly alleged synergistic relationship between the Copay Assistance and the other actionable antitrust conduct that comprises Count [Two].

(*Id.* at 53.) Thus, the Special Master recommended dismissing the copay assistance allegations from Count Two. (*Id.*)

Finally, the Special Master recommended the Court dismiss Count Three as a mere "repackaging" of an antikickback statute violation despite the fact that an antikickback statute violation is not a RICO predicate act. (*Id.* at 58.)

### iv.   *The Case Splits Between Wholesalers and Retailers*

#### a.   **Wholesaler Action**

The Original Plaintiffs did not object to the R&R. (*See* Joint Stipulation on Objections ("Objs. Stip.") at 2, ECF No. 236.) Instead, they sought leave to amend the Complaint to include copay assistance allegations from 2015, to 2018 (*see* Mot. for Leave to Amend, ECF No. 132), which the Special Master granted (Order Granting Leave to Amend, ECF No. 141). The Original Plaintiffs also agreed to waive any objection to the R&R not related to the copay assistance allegations. (Letter Order Granting Extension, ECF No. 136.)

The Original Plaintiffs filed an amended complaint in May 2025, adding new wholesaler plaintiffs[5] and advancing new copay assistance allegations ("Wholesaler Action"). (*See* Am. Compl., ECF No. 144.) Teva moved to dismiss the Amended Complaint in part. (*see* Mot. to Dismiss Am. Compl., ECF No. 166.) The Wholesalers opposed (Opp'n to MTD, ECF No. 182), and Teva replied (Teva Reply, ECF No. 185). That motion is pending before the Special Master.

### b.     Retailer Action

Independently of the Wholesaler Action, the Retailers filed a Sherman Act § 2 lawsuit against Teva in the District of Vermont on April 3, 2025 ("Retailer Action"). *See* Retailer Compl., *Walgreen Co. v. Teva Pharms. Indus., Ltd.*, No. 25-372 (D.Vt. Apr. 3, 2025), Dkt. No. 1. The Retailers' Complaint alleged Teva engaged in an overall scheme to monopolize the market for Copaxone. *Id.* Five months later, on September 24, 2025, the District of Vermont granted Teva's motion to transfer the Retailer Action to the District of New Jersey. *See* Order on Mot. to Dismiss or Transfer, *Walgreen*, No. 25-372 (D.Vt. Sept. 24, 2025), Dkt. No. 46. The case was transferred several weeks later. *See* Case Update, *Walgreen*, No. 25-372 (D.Vt. Oct. 17, 2025).

Following transfer, the Special Master consolidated the Retailer and Wholesaler Actions for all pretrial purposes. (Joint Stipulation on Consolidation, ECF No. 217.) In December 2025, the Special Master entered a stipulation providing that the Retailers and Teva agreed to be bound by the R&R with respect to Count Two of the Original Plaintiffs' Complaint (the overarching monopolization scheme), and providing the Retailers with the opportunity to object to "any aspect of that portion" of that R&R. (Objs. Stip. at 3–4.) Unlike the Wholesalers, the Retailers declined to amend the copay assistance allegations in the Complaint and instead stood on their anticipated

---

[5] The New Plaintiffs are: AmerisourceBergen Corporation; AmerisourceBergen Drug Corporation; H.D. Smith, LLC; Cardinal Health, Inc.; Cardinal Health P.R. 120, Inc.; and Morris & Dickson Co., L.L.C. The Court refers to the Original Plaintiffs and New Plaintiffs collectively as the Wholesalers.

16

objections to the R&R. (*Id.* at 4.) The Retailers also agreed to be bound by this Court's "forthcoming order on Mylan's Objections to the Mylan R&R relating to Mylan's sham petitioning allegations."[6] (*Id.*)

### v.   *The Retailers' Objections*

The Retailers objected to the Special Master's recommendations concerning the market switch and copay assistance. (Retailer Objs., ECF No. 242.)

First, the Retailers argue that the Special Master misinterpreted the Sherman Act's statute of limitations. (*Id.* at 8.) According to the Retailers, the Sherman Act's statute of limitations begins to run when a plaintiff's claim accrues, and a separate claim accrues each time a monopolist overcharges the plaintiff. (*Id.* at 10.) Thus, the Retailers claim the Special Master erred in dismissing the market switch and copay assistance allegations merely because they took place before 2018. (*Id.* at 12.)

Next, the Retailers assert that the Special Master erred in concluding that the market shift and copay assistance allegations should be dismissed because they did not cause harm during the limitations period. (*Id.* at 12.) In the Retailers' telling, there is no requirement that each element in an overall monopolistic scheme cause harm, let alone during the limitations period. (*Id.* at 12–17.)

Finally, the Retailers argue the market shift and copay assistance elements of the overall scheme were plausibly alleged to be independently unlawful. (*Id.* at 17–27.)

---

[6] Mylan, a pharmaceutical company, makes generic Copaxone. (*See* Compl. ¶ 2.) Mylan sued Teva in 2021, alleging an overall monopolistic scheme in violation of the Sherman Act § 2. *See* Compl., *Mylan Pharms. Inc. v. Teva Pharms. Indus. Ltd.*, No. 21-13087 (D.N.J. June 29, 2021), Dkt. No. 1.

## II.    LEGAL STANDARD

### A.    Special Masters

Rule 53(a) allows the Court to appoint a special master to "address pretrial and posttrial matters." The Court reviews objections to a special master's findings of fact and conclusions of law *de novo*. Fed. R. Civ. P. 53(f)(3)–(4). *De novo* review requires "an independent determination of a controversy that accords no deference to any prior resolution of the same controversy." *United States v. Raddatz*, 447 U.S. 667, 690 (1980) (Stewart, J., dissenting) (citation omitted).

### B.    Motion to Dismiss

Rule 12(b)(6) governs motions to dismiss for "failure to state a claim upon which relief can be granted." A complaint must contain "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*

The Court conducts a three-step inquiry in evaluating a motion to dismiss under Rule 12(b)(6). *Malleus v. George*, 641 F.3d 560, 563 (3d Cir. 2011). First, the Court identifies "the elements a plaintiff must plead to state a claim." *Iqbal*, 556 U.S. at 675. Second, the Court accepts all plaintiff's well-pleaded factual allegations as true and "construe[s] the complaint in the light most favorable to the plaintiff." *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009) (quoting *Phillips v. County of Allegheny*, 515 F.3d 224, 233 (3d Cir. 2008)). But the Court disregards "legal conclusions and recitals of the elements of a cause of action supported by mere conclusory statements." *Davis v. Wells Fargo*, 824 F.3d 333, 341 (3d Cir. 2016). Third, the Court

18

considers "whether the facts alleged in the complaint are sufficient to show that the plaintiff has a 'plausible claim for relief.'" *Fowler*, 578 F.3d at 211 (quoting *Iqbal*, 556 U.S. at 679).

## III.    DISCUSSION

### A.    Objection One: The Statute of Limitations

Sherman Act claims must be brought "within four years after the cause of action accrued." 15 U.S.C. § 15b. An antitrust cause of action accrues "when a defendant commits an act that injures a plaintiff's business." *Zenith Radio Corp. v. Hazeltine Rsch., Inc.*, 401 U.S. 321, 338 (1971). In the context of a continuing antitrust conspiracy, "each time a plaintiff is injured by an act of the defendants a cause of action accrues to him to recover the damages caused by that act." *Id.* Those damages must be "the proximate result of conduct occurring more than four years prior to the filing of the" antitrust lawsuit. *Id.* at 333. Therefore, "'each overt act that is part of the violation and that injures the plaintiff,' e.g., each sale to the plaintiff, 'starts the statutory period running again.'" *Klehr v. A.O. Smith Corp.*, 521 U.S. 179, 189 (1997) (citation omitted). "But the commission of a separate new overt act generally does not permit the plaintiff to recover for the injury caused by old overt acts outside the limitations period." *Id.* Accordingly, "an antitrust plaintiff may sue for injuries that are merely manifestations or reaffirmations of acts that occurred well before the start of the limitations period—especially if the plaintiff suffers an injury on a particular date." *Humana Inc. v. Celgene Corp.*, No. 19-7532, 2022 WL 1237883, at *7 (D.N.J. Apr. 27, 2022). "Moreover, as reflected in the case law, a continuing violation with respect to supracompetitive prices may occur for each sale of the unlawfully high-priced item." *Id.*

The Retailers argue the Special Master erred in recommending the Court dismiss the market switch and copay assistance allegations based on the time the allegations took place—i.e., before 2018—as opposed to when the Retailers suffered harm. (Objs. at 6–12.)

19

This argument misreads the R&R. To start, the Special Master did not recommend dismissing the copay assistance allegations as untimely. She considered the time at which the allegations arose, not whether the statute of limitations barred their consideration. And, contrary to the Retailers' assertions, the Special Master based her statute of limitations analysis on when the conduct took place *and* when any harm arose. That analysis was correct. The market shift and any attendant harms arose outside the statute of limitations.

This litigation started in 2022. Therefore, the Sherman Act's statute of limitations bars antitrust claims accruing before 2018. The market switch happened in 2014 and 2015—outside the limitations period. (Compl. ¶¶ 131–33, 140.) Likewise, the market shift did not cause any harm within the limitations period. An antitrust plaintiff can recover for conduct occurring outside the statute of limitations if they plausibly allege the conduct proximately caused harm occurring inside the statute of limitations. *Zenith Radio Corp.*, 401 U.S. at 333, 338. The Complaint alleges Teva switched from 20mg to 40mg Copaxone to avoid competition between brand 20mg Copaxone and generic 20mg Copaxone. (Compl. ¶ 121.) And the Complaint asserts the market shift harmed customers by forcing them to buy brand 40mg Copaxone instead of generic 20mg Copaxone. (*Id.* ¶ 142.) But generic 20mg and 40mg Copaxone were on the market through the entire limitations period of 2018 to 2022. So, even if the market shift forced customers to buy brand 40mg Copaxone instead of generic 20mg Copaxone, that is not a harm the Retailers suffered within the statute of limitations, because they could freely buy generic 20mg or 40mg Copaxone.

The Special Master, therefore, correctly concluded the market shift and any attendant harms took place outside the antitrust statute of limitations.

### B.    Objection Two: Overall Scheme Liability

Next, the Retailers argue the Special Master erred in dismissing the market shift and copay assistance allegations as part of an overall antitrust scheme. (Objs. at 12–17.) The Retailers claim the Special Master dismissed those allegations because the Complaint did not adequately allege the market shift or copay assistance harmed the Retailers during the limitations period. (*Id.* at 12–13.) According to the Retailers, there is no requirement for each element of an overall scheme to harm a plaintiff. So long as a scheme *as a whole* injures a plaintiff, say the Retailers, the Court may entertain any component of that scheme, even if it does not individually cause any harm to the plaintiff. (*Id.*)

This argument mischaracterizes the Special Master's overall scheme analysis. "It is not of importance whether the means used to accomplish the unlawful objective are in themselves lawful or unlawful." *Am. Tobacco Co. v. United States*, 328 U.S. 781, 809 (1946). If lawful acts "are part of the sum of the acts which are relied upon to effectuate the conspiracy which the statute forbids, they come within its prohibition." *Id.* The Court, therefore, considers "the monopolist's conduct taken as a whole rather than considering each aspect in isolation." *LePage's Inc. v. 3M*, 324 F.3d 141, 162 (3d Cir. 2003). That includes conduct that would, on its own, not violate § 2. However, for the Court to consider legal conduct as part of an anticompetitive scheme, the plaintiff must plausibly allege the legal conduct contributed to the scheme's anticompetitive effect. *Id.* (examining legal conduct as part of anticompetitive scheme where legal conduct "reinforced the exclusionary effect of" illegal conduct). Moreover, an antitrust complaint cannot be "devoid of allegations of truly anticompetitive conduct." *Phila. Taxi Ass'n, Inc v. Uber Techs., Inc.*, 886 F.3d 332, 341 (3d Cir. 2018) (affirming dismissal of § 2 claim where none of the conduct alleged in overall scheme was anticompetitive).

The Special Master carefully considered the "substantial body of law within the Third Circuit" as to overall scheme liability (R&R at 35) and concluded that lawful conduct may be considered as part of an overall scheme when those lawful acts contribute to exclusionary effect of plausibly alleged unlawful conduct. (*Id.* at 30–35). The Court agrees.

In dealing with a broad monopolistic scheme, "multiple courts, including within our Circuit, have found that it is appropriate to consider the individual components of the scheme and whether those components can substantiate a claim of anticompetitive conduct on their own, as long as the larger scope of the scheme is kept in context." *In re Revlimid & Thalomid Purchaser Antitrust Litig.*, No. 19-7532, 2024 WL 2861865, at \*39 (D.N.J. June 6, 2024); *see also LePage's*, 324 F.3d at 162 (looking at "synergistic effect" of exclusionary practices (citation omitted)); *Phila Taxi Ass'n*, 886 F.3d at 340–41 (analyzing individual categories of purported exclusionary conduct and concluding complaint was "devoid of allegations of truly anticompetitive conduct."); *3Shape Trios A/S v. Align Tech., Inc.*, No. 18-1332, 2019 WL 3824209, at \*10–12 (D. Del. Aug. 15, 2019) (concluding that "unilateral acts otherwise insulated from antitrust scrutiny" could not "be pled together to state a Section 2 violation," and "requiring plaintiffs to plead at least one instance of conduct not otherwise insulated from antitrust scrutiny."), *report and recommendation adopted,* No. 18-1332, 2019 WL 4686614 (D. Del. Sept. 26, 2019); *In re Suboxone (Buprenorphine Hydrochloride & Naloxone) Antitrust Litig.*, 622 F. Supp. 3d 22, 59–63 (E.D. Pa. 2022) (considering exclusionary effects of individual components of overall monopolistic scheme). The Special Master, having surveyed those holdings, properly considered whether the individual components of the overall scheme to protect Copaxone contributed to its overall exclusionary effect.

The R&R, moreover, does not suggest the Special Master "tightly compartmentaliz[ed] the various factual components [of the scheme] and wip[ed] the slate clean after scrutiny of each." *Cont'l Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 699 (1962). To the contrary, the Special Master considered whether the market switch and copay assistance had any "plausibly articulated synergy" with the rest of the overall scheme. (R&R at 48; *see also id.* at 53.) Having reviewed the record, the Court agrees they did not.

To start, the Special Master correctly concluded (and the Retailers do not dispute) that Teva's conduct *before* generic approval (i.e., the market shift and copay assistance) was "separate and distinct" from what Teva allegedly did to deter generic competition *after* generic approval (i.e., the exclusionary contracts and DAW Campaign). (*Id.* at 47–48.) The Complaint does not plausibly allege Teva's pre-generic approval conduct augmented or even contributed to Teva's post-generic approval conduct. Nothing in the Complaint shows that the switch from 20mg to 40mg Copaxone, which took place before the FDA approved any generics, combined with Teva's alleged scheme to harm competition with generics. Likewise, the Complaint does not plausibly demonstrate that subsidizing Copaxone costs for patients, which, again, largely took place before anyone could buy generic Copaxone, augmented Teva's plan to suppress generic competition. Simply put, the Complaint does not plausibly allege the market switch or copay assistance had any effect on the adequately pled elements of the overall scheme—the exclusionary contracts and DAW Campaign. Because the Special Master (1) appropriately considered whether the individual elements of the overall anticompetitive scheme enhanced the scheme's exclusionary effect, and (2) properly concluded that neither the market switch nor the copay assistance synergized with the overall anticompetitive scheme, the Court overrules the Retailers' second objection.

C.    **Objection Three: Unlawful Conduct**

23

Finally, the Retailers argue the Special Master erred in concluding the market shift and copay assistance could not individually give rise to § 2 liability.

### i.    Market Shift

The Special Master concluded the market shift could not individually give rise to § 2 liability because it fell outside the statute of limitations. The Retailers sidestep the Special Master's conclusion, arguing the timing of the market shift "is completely irrelevant." (Objs. at 21.) Instead, the Retailers argue the market shift was individually unlawful because it "interfered with automatic substitution of, and thereby suppressed generic competition from, the generic 20 mg product." (Objs. at 19.) But, as discussed above, the market shift and its attendant harms took place outside the limitations period. So, the market shift could not individually give rise to § 2 liability.

### ii.    Copay Assistance

The Special Master found the copay assistance allegations were not individually unlawful because (1) the Complaint did not explain how copay assistance to privately insured patients, which is legal, could be part of a Sherman Act claim; and (2) the Complaint did not adequately allege how copay assistance to Medicare patients harmed competition, particularly when reducing prices is competitive, and copay assistance took place for nine years before any generic reached the market.

The Court agrees with the Special Master that the copay assistance allegations do not form an antitrust injury. § 2 "makes it unlawful to monopolize, attempt to monopolize, or conspire to monopolize, interstate or international commerce." *Broadcom Corp. v. Qualcomm Inc.*, 501 F.3d 297, 306 (3d Cir. 2007) (citing 15 U.S.C. § 2). To state a monopolization claim, the plaintiff must plausibly allege (1) the defendant has "monopoly power in the relevant market" and (2) defendant willfully acquired or maintained monopoly power, "as distinguished from growth or development

24

as a consequence of a superior product, business acumen, or historic accident." *Id.* at 307 (quoting

*United States v. Grinnell Corp.*, 384 U.S. 563, 570–71 (1966)).

"Monopoly power is the ability to control prices and exclude competition in a given

market." *Broadcom*, 501 F.3d at 307. Yet simply having monopoly power, by itself, is not

unlawful. *Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398, 407

(2004). "The opportunity to charge monopoly prices—at least for a short period—is what attracts

'business acumen' in the first place; it induces risk taking that produces innovation and economic

growth." *Id.* "To safeguard the incentive to innovate, the possession of monopoly power will not

be found unlawful unless it is accompanied by an element of anticompetitive conduct." *Id.*

Anticompetitive conduct is "generally defined as conduct to obtain or maintain monopoly

power as a result of competition on some basis other than the merits." *Broadcom*, 501 F.3d at 308

(citing *LePage's Inc. v. 3M*, 324 F.3d 141, 147 (3d Cir. 2003)). "Conduct that impairs the

opportunities of rivals and either does not further competition on the merits or does so in an

unnecessarily restrictive way may be deemed anticompetitive." *Id.* (citing *Aspen Skiing Co. v.*

*Aspen Highlands Skiing Corp.*, 472 U.S. 585, 604–05, 605 n.32 (1985)).

"To establish an actionable antitrust violation, [the plaintiff] must show both that [the

defendant] engaged in anticompetitive conduct and that [the plaintiff] suffered antitrust injury as

a result." *Eisai, Inc. v. Sanofi Aventis U.S., LLC*, 821 F.3d 394, 402 (3d Cir. 2016). An antitrust

injury is: "(1) harm of the type the antitrust laws were intended to prevent; and (2) an injury to the

plaintiff which flows from that which makes defendant's acts unlawful." *ZF Meritor, LLC v. Eaton*

*Corp.*, 696 F.3d 254, 281 (3d Cir. 2012) (quoting *Race Tires Am., Inc. v. Hoosier Racing Tire*

*Corp.*, 614 F.3d 57, 76 (3d Cir. 2010)). Antitrust laws protect "*competition*, not *competitors*."

*Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 224 (1993) (quoting

25

*Brown Shoe Co. v. United States*, 370 U.S. 294, 320 (1962)). So, an antitrust plaintiff must show that (1) the complained-of anticompetitive conduct harmed "the competitive process itself," *Broadcom*, 501 F.3d at 308, and (2) the plaintiff suffered an injury "stem[ming] from a competition-*reducing* aspect or effect of the defendant's behavior," *Atl. Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 344 (1990).

The Retailers argue that copay assistance made brand Copaxone more affordable, thereby keeping patients on brand Copaxone and allowing Teva to maintain its monopoly. According to the Retailers, "*[a]ny conduct* that induces patients to stay on branded drugs in the face of . . . generic competition interferes with automatic substitution and allows branded companies to maintain monopoly power beyond its legally prescribed expiration date." (Objs. at 24.)

The Retailers' extraordinary proposition—that *any conduct* causing patients to choose brand drugs over generics is anticompetitive—is misguided. Anticompetitive conduct is "competition on some basis other than the merits." *Broadcom*, 501 F.3d at 308 (citing *LePage's*, 324 F.3d at 147). Competition on the merits "produces innovation and economic growth." *Id.* Cutting prices usually "represents competition on the merits" because it "reflects the lower cost structure" of the competitor. *Brooke Grp.*, 509 U.S. at 223. Indeed, "cutting prices in order to increase business often is the very essence of competition." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 594 (1986). "To hold that the antitrust laws protect competitors from the loss of profits due to such price competition would, in effect, render illegal any decision by a firm to cut prices in order to increase market share. The antitrust laws require no such perverse result." *Brooke Grp.*, 509 U.S. at 223 (quoting *Cargill, Inc. v. Monfort of Colo., Inc.*, 479 U.S. 104, 116 (1986)); *see also Atl. Richfield Co.*, 495 U.S. at 340 ("Low prices benefit consumers

regardless of how those prices are set, and so long as they are above predatory levels, they do not threaten competition. Hence, they cannot give rise to antitrust injury.").

Teva's copay assistance made Copaxone cheaper. The fact that patients stayed on Copaxone reflects the results of legitimate price competition. Nothing in the Complaint suggests otherwise. Nor have the Retailers offered any support for their *per se* rule barring any competition between brand and generic drugs,[7] which the Court declines to adopt. Therefore, copay assistance, on its own, did not violate the Sherman Act § 2. Accordingly, the Court finds, as did the Special Master, that copay assistance was not independently unlawful.

## IV.   CONCLUSION

For the foregoing reasons, the Court **ADOPTS** the Special Master Faith S. Hochberg's Report and Recommendation recommending the Court grant Defendant Teva's motion to dismiss in part the Complaint. (ECF No. 128). An appropriate Order accompanies this Opinion.

**DATED: 4/13/2026**

JULIEN XAVIER NEALS
United States District Judge

---

[7] At most, the Retailers cite *In re Loestrin 24 Fe Antitrust Litigation*, 433 F. Supp. 3d 274, 330–31 (D.R.I. 2019). (Objs. at 25–26.) There, the court identified conduct, including a "patient savings program," that rose to the level of anticompetitive conduct. *Loestrin*, 433 F. Supp. 3d at 330–31. But the *Loestrin* court did not hold that a "patient savings program" *on its own* was anticompetitive. *See id.* at 331. Here, the Retailers argue Teva's patient savings program, on its own, was anticompetitive. So, *Loestrin* has no bearing on the Court's conclusion. Likewise, the Retailers' citations to cases involving "reverse payments" are unavailing. (*See* Objs. at 25.) A reverse payment occurs when a brand drug manufacturer pays a generic drug manufacturer to not make a generic drug until the brand drug's patent expires. *F.T.C. v. Actavis, Inc.*, 570 U.S. 136, 140–41 (2013). Reverse payments "can sometimes unreasonably diminish competition." *Id.* at 141. Teva's copay assistance was not a reverse payment and the Retailers have not demonstrated how it would delay generic competition in the same manner as a literal agreement not to produce generic drugs.

27